UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ISAAC KELVIN ALLEN,

Petitioner,

vs.

CASE NO. 8:09-cv-136-T-27EAJ
Crim. CASE NO. 8:07-cr-212-T-27EAJ

UNITED STATES OF AMERICA,

Respondent.

______________________________/

# ORDER

An evidentiary hearing was conducted on July 28, 2010 on Grounds One and Four[1] of Petitioner's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (CV Dkt. 1), which allege ineffective assistance of counsel. Counsel was appointed to represent Petitioner. Based on the testimony and evidence presented, the Court finds that Grounds One and Four lack merit and warrant no relief.

**Ground One**

In Ground One, Petitioner contends that counsel failed to file a notice of appeal despite having been requested to do so. *See Gomez-Diaz v. United States*, 433 F.3d 788 (11th Cir. 2005). Petitioner testified that he instructed his attorney to appeal his sentence, including a special condition of his supervised release which prohibited Petitioner from having contact with Tara Pasco, his common law wife and mother of his minor child, without the prior express approval of the United

[1] Grounds Two and Three were denied by previous order entered on June 25, 2010 (CV Dkt. 27).

States Probation Office and this Court. (*See* CR Dkt. 47, p. 4).[2] In his motion, Petitioner claimed that his "attorney conjectured that the court had unknowingly erred during sentencing" by imposing this condition and "presumed the court would recognize the error and amend its judgment." Petitioner alleged that counsel "was convinced [that] due to such an error, that this special condition of supervision would not appear within the Petitioner's judgment." He further alleges that "rather than . . . file an appeal as requested by Petitioner, counsel deluded the issue, and cajoled Petitioner to sign an Appeal Waiver, with the promise and contingency commitment that counsel would file an appeal in the event the above-said Special Condition of Supervision was found within Petitioner's judgment." (CV Dkt. 1, Attach. 1, p. 12).

When he was sentenced, Petitioner understood that as a condition of supervised release, he was to have no contact with his common law wife Tara Pasco and co-perpetrator who had cooperated against him. After he was sentenced, Petitioner's attorney met with him and discussed his right to appeal, including the special condition of his supervised release. According to Petitioner, his attorney advised Petitioner that contrary to Petitioner's recollection, the judge ordered that Petitioner could not associate with Pasco.

When Petitioner and his attorney met, the written judgment was not yet available. Petitioner testified that because neither he nor counsel knew what the written judgment would say, he felt that he could make a decision regarding whether or not to appeal once he saw the actual judgment. Petitioner acknowledges, however, that he signed a document presented to him by his attorney entitled "Defendant's decision regarding an appeal," expressly confirming that he did not request

[2] Petitioner pleaded guilty pursuant to a Plea Agreement, which included an appeal waiver clause. (CR Dkts. 34, 52). Petitioner testified that prior to his guilty plea, his retained attorney, Lori Palmieri, thoroughly discussed the appeal waiver clause in his Plea Agreement and that he was satisfied with her explanation.

counsel to file an appeal on his behalf. (Gov't Exh. 1). According to Petitioner, he told his attorney that if the judgment stated that he could not have contact with Pasco, he wanted to appeal.

Petitioner's attorney testified that two days after sentencing, she met with Petitioner for nearly an hour at the Orient Road jail in Tampa and discussed his right to appeal. She brought with her a form she drafted for Petitioner to document his decision about whether or not to appeal. According to Palmieri, Petitioner indicated that he did not want to appeal and signed the form confirming his decision. (Gov't Exh. 1). Palmieri testified that she had no conversation with Petitioner about filing an appeal contingent upon the wording of the written judgment. Palmieri testified that had Petitioner asked her to file a notice of appeal, she would have been happy to do so but that he never asked her to appeal any issue to the Eleventh Circuit.

The Court finds Palmieri's testimony credible. She is an experienced criminal defense attorney who regularly represents private and CJA clients before the Court. She documented her contacts with Petitioner and fulfilled her Sixth Amendment responsibility to discuss the advantages and disadvantages of pursuing an appeal with Petitioner and determine his wishes. Moreover, she had him document his decision in writing. She has no reason to fabricate or color her testimony. Her testimony, considered in conjunction with her affidavit[3] and the "Defendant's Decision

---

[3] The Government attached to its response to Petitioner's motion to vacate, an affidavit from Palmieri in which she avers in part:

> 6. I visited [Petitioner] in the Orient Road Jail on January 17, 2008, to specifically address whether he wanted to file an appeal. Given that the sentence imposed did not trigger one of the exceptions to the appeal waiver, [Petitioner] signed the "Defendant's Decision Regarding Appeal" . . . . Contrary to [Petitioner]'s assertions, this was not a "contingency commitment" appeal decision. [Petitioner] did not request nor did I agree to file an appeal on his behalf.
>
> 7. The Defendant never requested that I file an appeal within the 10 days from entry of the judgment or anytime thereafter.

(CV Dkt. 15, Attach. 1, p. 2). The Government also attached to its response the "Defendant's Decision Regarding an

Regarding an Appeal" signed by Petitioner which confirmed his decision not to appeal, establishes that Petitioner did not, contrary to his testimony, instruct her to file an appeal on his behalf.

To the contrary, Petitioner's testimony was not credible. He stands convicted of fraudulent behavior and aggravated identity theft. By his own admission, he has a history of fraud related convictions. He presented as manipulative and calculating. His testimony that he instructed Palmieri to file an appeal is not believable and is contradicted by the form he signed confirming his decision not to appeal. His attempt to rationalize his signature on the form was not persuasive. Likewise, his testimony that he told Palmieri that he wanted to appeal if the written judgment prohibited contact with Tara Pasco is simply not credible. Finally, Palmieri's testimony and documented file entries undermine his allegations and contentions. Nothing in the record establishes that Petitioner, either directly or through an intermediary,[4] ever instructed Palmieri to file a direct appeal on his behalf.

Palmieri fulfilled her duty to explain the advantages and disadvantages of appealing and determine her client's wishes. Palmieri's consultation with Petitioner after he was sentenced satisfied the requisite "reasonable effort to determine the client's wishes." *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000). Palmieri therefore met "an objective standard of reasonableness" under *Strickland* and rendered effective assistance of counsel. *Gomez-Diaz v. United States*, 433 F.3d at 792. This is not a case, therefore, in which counsel neglected to consult with the client about the client's appellate rights or disregarded a specific request that counsel file an appeal.

---

Appeal" signed by Petitioner which states that he did not request counsel to file a notice of appeal (CV Dkt. 15, Attach. 1, p. 5). That document was introduced as Government Exhibit 1.

[4] Palmieri had contact with Petitioner's sister throughout Petitioner's case. After sentencing, they exchanged emails concerning Petitioner's desire to have certain personal property returned to him. There was nothing in the sister's email regarding Petitioner's concern about not having contact with Tara Pasco. Further, Palmieri testified that she had no communication with Petitioner's sister about filing an appeal on Petitioner's behalf.

It is well settled that an attorney who fails to file an appeal on behalf of a client who specifically requests an appeal acts in a professionally unreasonable manner. *Roe v. Flores-Ortega*, 528 U.S. at 477. However, where, as here, Petitioner's attorney consulted with him regarding his right to appeal, determined and confirmed his wishes not to appeal in writing, and was never instructed to file an appeal, counsel cannot be said to have rendered ineffective assistance. Petitioner has not demonstrated that counsel was ineffective under *Strickland.* Ground One is accordingly DENIED.

**Ground Four**

Petitioner was charged in a four-count indictment with making a false statement to a financial institution (Counts One and Two) and aggravated identity theft (Counts Three and Four). (CR Dkt. 3). Petitioner pleaded guilty pursuant to a Plea Agreement that specified in the factual basis that the loss amount attributable to Petitioner for sentencing guideline purposes was more than $200,000. (CR Dkt. 34, p. 14). Petitioner alleges that his trial counsel rendered ineffective assistance by failing to object at sentencing to the Court's determination that the total loss amount exceeded $200,000.

Petitioner argues that after his Plea Agreement was accepted, the district court determined the loss amount to be in excess of $200,000, despite an agreement negotiated during the plea hearing that the loss amount would read "more than $120,000." He complains that as a result, his base offense level increased by twelve levels, rather than ten levels if the loss amount was limited to "more than $120,000" but less than $200,000. *See* USSG § 2B1.1(b)(1).

During the plea colloquy, the prosecutor recited the factual basis supporting the charged offenses:

Court: Now, at this time the Government is going to tell the Court what the facts are that support these offense charges. Listen carefully to what is being said, Mr.

Allen, because once the Government finishes, I will ask you whether you agree with these facts.

These facts will be used for all purposes, not only to determine whether these elements can be met, but these facts will be used by the office of probation to determine what is the appropriate penalty to recommend to the Court, and then again by the Court to assess that recommendation; do you understand?

Defendant: Yes, ma'am.

Prosecutor: Thank you, Your Honor. Your Honor, Branch Banking and Trust, hereinafter BB&T, and Fifth Third Bank, hereinafter, Fifth Third, are financial institutions, the deposits of which are insured by the Federal Deposit Insurance Corporation.

On or about February 20th, 2007, in the Middle District of Florida, the defendant, Isaac Kelvin Allen, visited BB&T and Fifth Third. In each bank he presented a fraudulent driver's license which contained his picture but listed his name as Dan Harris, an actual living person.

The defendant also provided Harris'[s] social security number and date of birth as his own, and furnished the financial institutions with a mail drop address and a fictitious place of employment.

He opened checking accounts - - checking and savings accounts at both banks and also applied for credit cards and lines of credit for both of [the] banks.

Both banks approved lines of credit and issued the defendant credit cards. During the next two months the defendant drew down on the lines of credit and utilized his - - the credit cards and failed to repay either bank. Mr. Harris did not authorize the defendant to use his name or social security number.

On or about March 8, 2007, acting in concert with the defendant, his girlfriend, Tara Pasco, went to the same

two financial institutions, used a fictitious identity, supplied the name and social security number of an actual living person, and applied for credit cards and lines of credit. She specifically referenced the defendant as recommending that she apply to those financial institutions. She received credit cards and lines of credit and drew down on them but failed to repay either institution.

Between 2004 and the present, the defendant defrauded several other financial institutions in the Middle District of Florida, using a plethora of false identities. The loss amount for sentencing guideline purposes is more that $200,000.

Court: Sir, you have heard the facts as stated?

Defendant: Yes, ma'am.

Court: Are they true?

Defendant: Yes, ma'am.

Court: Do you have any dispute about the facts as stated?

Defendant: No, ma'am.

Court: Any dispute at all, Mr. Allen?

(Pause).

Defendant: Can I confer?

Court: Yes, you may.

[Counsel]: May I just speak with [the prosecutor] for a second?

Court: Yes.

(Pause).

. . .

[Prosecutor]: If, uh - - the parties - - I have just spoken with [counsel], and, uh, I think it makes things easier if I revise the last sentence in the proffered factual basis in this case.

And I would revise it to read: The loss amount for Sentencing Guideline purposes in the Middle District of Florida is more than $120,000.

Court: $120,000?

[Prosecutor]: Yes, Your Honor.

Court: [Counsel]?

[Counsel]: And that's acceptable to us, Judge, that was a little bit of a hang-up, uh, and that language is acceptable to Mr. Allen.

(CR Dkt. 52, pp. 25-29).

The PSR specified the intended loss in the case as "more than $200,000 but not more than $400,000," resulting in a twelve level increase in Petitioner's offense level (PSR ¶34). During the sentencing hearing, neither counsel nor the Government alerted the Court of the reduced loss amount discussed and agreed to during the plea colloquy. Petitioner argues that counsel's failure to alert the Court during sentencing to the "more than $120,000" loss amount discussed during the plea hearing resulted in him receiving a higher sentence because of the two-level difference between a $120,000 loss and a $200,000 loss.[5]

Petitioner testified during the evidentiary hearing that prior to his change of plea, he and Palmieri "repeatedly" discussed the sentencing guidelines concerning the loss amount. He testified

[5] The Sentencing Guidelines provide that a loss of more than $120,000 but less than $200,000 results in a ten-level increase in the base offense level, while a loss of more than $200,000 results in a twelve-level increase. U.S.S.G. § 2B1.1(b)(1)(F), (G).

that he advised Palmieri during the plea colloquy that he did not want to proceed with his plea if the loss amount was calculated at more than $200,000. Petitioner stated that Palmieri conferred with the prosecutor during the plea hearing and that the prosecutor agreed to change the loss amount to "more than $120,000 in the Middle District of Florida." Petitioner testified that as a result of this change, he believed that he was pleading to the lower amount, thereby limiting his sentencing exposure by two levels. Notwithstanding, Petitioner testified that when Palmieri reviewed the PSR with him, they discussed the "more than $200,000" loss amount included in the PSR, and acknowledged that Palmieri advised him that the "more than $120,000" figure was not binding upon the district court.

In his direct testimony, Petitioner testified that he believed the changed loss amount determined his guidelines range. However, on cross-examination, he acknowledged that his Plea Agreement, even with the changed loss amount of "more than $120,000," did not impose a ceiling on the loss amount for which he might be held accountable. He acknowledged that the district court was not bound by the loss amount specified in his Plea Agreement and that the parties could not bind the district court as to his sentence or guideline calculations, consistent with what Ms. Palmieri had explained to him. Petitioner admitted that he knew that the Government found approximately twenty to thirty different driver's licenses from different states with Petitioner's picture and different names, and that based on that, the Government could have established a much greater loss amount than what was specified in the Plea Agreement.

Upon questioning by the Court, Petitioner acknowledged that the magistrate judge advised him during the plea colloquy that his guidelines range would be determined at the time of sentencing and that he understood that the range would be calculated in part based upon the amount of loss.

Petitioner further testified that he understood that the district court would determine his guidelines range and sentence after the PSR was prepared and objections thereto were resolved at sentencing.

Palmieri testified that she and Petitioner discussed actual versus intended loss amount on numerous occasions, and that the majority of their discussions involved the amount of loss. Their objective was to keep the intended loss below $200,000 because the intended loss would be more than actual loss. He understood that the factual basis in the Plea Agreement was not the "end" determination of loss, and "clearly" understood that Probation would calculate the amount of loss, subject to a factual resolution of their objections at sentencing. Petitioner did not believe the amount of loss "added up" to what the Government thought, but he understood that ultimately, the district court would determine the loss amount. She explained that she advised Petitioner that the Government had the burden of establishing the loss amount and that the Court would consider that amount in determining the appropriate sentencing guidelines. She testified that Petitioner had admitted to her that he had been defrauding people for quite sometime and that the outstanding question at the time of the plea was how much information the Government had and what loss amount it would be able to prove.[6]

During the plea hearing Petitioner "unexpectedly" disagreed with the loss amount in the Plea Agreement and advised Palmieri that he was uncomfortable with agreeing to the "more than $200,000" loss amount stated in the plea agreement. At that point, Palmieri spoke with the prosecutor who agreed that if Petitioner wanted to continue with his plea, the prosecutor would agree

[6] Palmieri testified that Petitioner confided to her that his fraudulent activities amounted to an excess of three million dollars. She further testified that Petitioner attempted to continue his fraudulent activities from jail and as a result, the objective was to get Petitioner's plea entered before more information was discovered by law enforcement.

to a loss amount in excess of $120,000, a condition she relayed to Petitioner. At no time did Palmieri advise Petitioner that the Government would cap the loss amount. She explained to Petitioner that although the Government agreed to revise the amount listed in the plea agreement, because law enforcement officials were investigating Petitioner's activities in other jurisdictions, the final loss amount was unknown at that time.

Palmieri testified that Petitioner never indicated to her after the magistrate judge asked him if he agreed with the facts presented at the plea hearing that he did not want to go forward with his plea. In response to the Court's questions, Palmieri testified that Petitioner was comfortable with agreeing to a loss amount of at least $120,000 because he knew that the Government could prove that amount but was unsure how much more the Government could prove and therefore did not want to agree to the $200,000 amount.

Palmieri had "extensive" discussions with Petitioner about the guidelines and how the loss amount would drive the guidelines, and that the loss amount was a factual determination which would be made by the district court at sentencing. She and Petitioner discussed his objections to the PSR but Petitioner never took the position that the amount he agreed to as a loss "capped" the amount of loss.[7]

Upon consideration of the testimony and evidence presented during the evidentiary hearing and in the record, the court finds that Ground Four lacks merit. The record shows that during Petitioner's Rule 11 colloquy, the magistrate judge explained and Petitioner acknowledged that the district judge would determine his sentence and that any agreement or potential reduction or

---

[7] Petitioner filed several objections to the PSR both through counsel and *pro se,* challenging the amount of loss suffered by certain victims (CV Dkt. 16, Ex. E). Petitioner ultimately withdrew these objections.

adjustment of the sentence did not bind the district judge.[8] Petitioner acknowledged that the factual basis in the plea agreement did not bind the Court as to any particular loss amount or sentencing range. Petitioner and counsel had extensive discussions about the loss amount before sentencing and Petitioner admitted that he understood that the loss amount would be determined by the district judge at sentencing after resolution of any objections to the PSR. Neither the plea agreement nor any other document capped the loss amount. Petitioner acknowledged that he understood that the Probation Office would calculate the loss amount in the PSR. Petitioner lodged no objection at sentencing to the actual or intended loss amounts specified in the PSR. In sum, Petitioner clearly understood that any agreement between himself and the prosecutor concerning the loss amount as stated in the factual basis of the plea agreement was not binding on the district judge.

---

[8] During the plea colloquy Petitioner was advised:

Court: Now, keep in mind that the agreements the parties have reached with respect to potential reduction or adjustment of sentencing do not bind the District Judge. The District Judge is free to sentence the party to the maximum extent allowed by law without regard to any agreements the parties may have made to the contrary; do you understand that?

Defendant: Yes, ma'am.

. . .

Court: Sometimes when you're talking with your lawyer or discussing things with the Government, people will attempt to predict for you what they think the outcome of your case will be in the way of sentencing. This could be based upon what they think your guidelines range will be, or in some cases, based upon their view about their special knowledge of the judge's sentencing practices in cases similar to yours.

Keep in mind that no one has the authority to predict with any certainty what your sentence will be. The District Judge has the sole authority to set sentence and if you rely upon what anyone may have told you as a guarantee, you could be disappointed at the point of sentencing, and you will not at that time be allowed to withdraw your plea; do you understand that?

Defendant: Yes, ma'am.

(CR Dkt. 52, pp. 13-14, 19).

Petitioner fails to establish that Palmieri rendered ineffective assistance by failing to object at sentencing to the Court's determination that the total loss amount exceeded $200,000. He demonstrates neither that counsel performed deficiently nor that absent her alleged error, he would have received only a ten-level increase in his sentence rather than the twelve-level increase applied at sentencing. Petitioner fails to establish deficient performance or prejudice from any claimed deficient performance on the part of counsel. Accordingly, he fails to satisfy the two pronged test in *Strickland* and Ground Four is accordingly DENIED. *See Strickland v. Washington*, 466 U.S. at 691-92.

**CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED**

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (*quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (*quoting Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

Accordingly, it is **ORDERED AND ADJUDGED** that Grounds One and Four of Petitioner's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (CV Dkt. 1) are **DENIED**. The clerk is directed to enter judgment against Petitioner and close this case.

**DONE AND ORDERED** in chambers this 12th day of August, 2010.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Petitioner, *pro se*
Counsel of record